UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.

| | |
|---|---|
| AARON SILBERMAN, an individual, and AMJ MISIL AB LLC, a Florida limited liability company | ) ) ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| PREMIER BEAUTY AND HEALTH LLC, a Florida limited liability company, JORGE HANE, an individual, and FLORENCIA HANE, an individual, jointly and severally, | ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs, Aaron Silberman ("Silberman") and AMJ Misil AB LLC ("AMJ"), by and through their undersigned counsel, bring this action against Defendants, Jorge Hane ("Jorge"), Florencia Hane ("Florencia"), and Premier Beauty and Health LLC ("Premier") (Jorge, Florencia, and Premier shall hereinafter be collectively referred to as "Defendants"), and state as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendants' intentional misrepresentations of material fact, untrue statements of material fact, and omissions of material fact made for the purpose of inducing Plaintiff AMJ's investment of Four Hundred Fifty Thousand Dollars ($450,000) (the "Investment Funds") in Defendant Premier through Defendants' offering and sale of unregistered securities issued by Defendant Premier (the "Securities").

2.     When Defendants offered to sell the Securities to Plaintiffs, they represented to Plaintiffs that Defendant Premier: (i) marketed and sold CBD[1] products containing proprietary chemical formulas formulated and developed by Defendant Premier ("CBD Blends"); (ii) was the sole owner of the intellectual property rights in and to the CBD Blends; (iii) hired Dr. Jeffrey Lin - a medical doctor trained at Harvard University and Yale University - to personally create and develop the proprietary CBD Blends; (iv) secured exclusive rights to be the first and only company to market and sell CBD products on TV home shopping networks; (v) was directed and managed by Defendant Jorge, an industry expert with over thirty (30) years of experience in marketing and selling consumer products via infomercials and TV home shopping networks, whose status as a co-founder of the National Infomercial Marketing Association and whose relationship with the owner and CEO of ShopHQ[2] guaranteed that Defendant Premier's sales would exceed Twelve Million Dollars ($12,000,000) in the first year alone; (vi) already had a special agreement, as a result of Defendant Jorge's relationship with the owner and CEO of ShopHQ, pursuant to which ShopHQ would deviate from its standard business practice by purchasing rather than consigning Defendant Premier's CBD products, thereby assuring Defendant Premier of guaranteed sales and revenue; (vii) would receive its first purchase order from ShopHQ no later than September of 2019, and would be selling its CBD products live on ShopHQ by October of 2019; (viii) would be selling other products in addition to its CBD products, including a hi-tech reliever and protein bars that Defendant Jorge had originally planned to sell through a different entity but would instead do so through Defendant Premier (the "Additional Products"), thereby raising Defendant Premier's

---

[1] CBD is the abbreviation for cannabidiol, one of the chemical compounds found in hemp.
[2] ShopHQ is a digital retailer with a television home shopping network that showcases products throughout the United States. ShopHQ's live television programming reaches over 87 million homes in the country via cable affiliates and satellite, and is also streamed live on select mobile devices and on Facebook.

valuation; (ix) had sufficient cash reserves to operate Defendant Premier's business without financial constraints; and (x) would employ Plaintiff Silberman, a member of Plaintiff AMJ, and provide him with the opportunity to develop and advance his career.

3.      Contrary to Defendants' representations, Defendant Premier: (i) neither formulated nor developed the CDB Blends, and instead purchased the chemical formulas contained in its CBD products from a company by the name of Cosmetic Solutions; (ii) did not own any intellectual property rights in and to any CBD Blends; (iii) had not secured any exclusive rights to be the first and only company to market and sell CBD products on TV home shopping networks; (iv) did not have any agreement with ShopHQ under which ShopHQ would purchase rather than consign Defendant Premier's CBD products; (v) did not receive any purchase orders from ShopHQ by September of 2019, nor did it get any air time on ShopHQ by October of 2019;  (vii) never offered for sale or sold the Additional Products; (viii) did not have sufficient cash reserves to properly operate its business; and (ix) did not have any intention of employing Plaintiff Silberman, and solely promised Plaintiff Silberman long-term employment to induce Plaintiff AMJ's investment.

4.      As part of and in furtherance of their fraudulent scheme, Defendants embezzled part of the Investment Funds and knowingly and intentionally presented financial documents to Plaintiff AMJ and other potential investors of Defendant Premier, which documents misrepresented and/or omitted critical and material information about Defendant Premier.

5.      In addition, Defendants failed to disclose information material to Plaintiff AMJ's purchase of the Securities.

6.      Defendant Premier, at the direction and control of Defendants Jorge and Florencia, employed Plaintiff Silberman on August 19, 2019. Upon Plaintiffs' discovery of Defendants' fraudulent scheme, and twelve (12) days after Defendant Premier's full receipt of the Investment

Funds, Defendants swiftly terminated Plaintiff Silberman's employment with Defendant Premier, without cause, and cut off Plaintiff Silberman's access to his business emails and Plaintiff AMJ's access to Defendant Premier's books and records.

7.     Defendant Premier breached its employment agreement with Plaintiff Silberman by failing to make wage payments due thereunder.

8.     In order to both induce investments such as the one made by Plaintiff AMJ, and market and sell Defendant Premier's products to prospective consumers, Defendants Jorge and Florencia – motivated by personal financial gain – consistently make deceitful and intentional misrepresentations about Defendant Premier and its CBD products.

### JURISDICTION AND VENUE

9.     Subject matter jurisdiction exists pursuant to 28 U.S.C. §1331 over Plaintiffs' cause of action founded upon 15 U.S.C. § 77l, 15 U.S.C. § 77o, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5 promulgated thereunder, and 15 U.S.C. § 77t.

10.    This Honorable Court has supplemental jurisdiction over Plaintiffs' pendent state claims pursuant to 28 U.S.C §1367 because they are directly related to Plaintiffs' federal claims and form part of the same case or controversy.

11.    Pursuant to Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, venue for this action properly lies in this Honorable Court because the transactions, acts, practices, and course of business giving rise to Plaintiffs' claims took place in Miami-Dade County, Florida, and because at all material times hereto, Defendants conducted business, maintained their principal place of business, and resided in Miami-Dade County, Florida.

12.    Defendants, directly or indirectly, used the means or instruments of interstate commerce or the mails in connection with the acts described in this Complaint.

13.     All conditions precedent to the initiation of the claims set forth in this Complaint have been performed, satisfied, excused, or waived.

14.     Plaintiffs have retained the undersigned attorneys to represent them in this action and have agreed to pay reasonable attorneys' fees and costs for such legal services.

## PARTIES

15.     Plaintiff Silberman is an individual residing in Miami-Dade County, Florida and is *sui juris.*

16.     Plaintiff AMJ is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

17.     Defendant Jorge is an individual residing in Miami-Dade County, Florida, and is *sui juris*.

18.     Defendant Florencia is an individual residing in Miami-Dade County, Florida, and is *sui juris*.

19.     Defendant Premier is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

20.     Defendant Premier has two (2) members – Defendant Florencia and Plaintiff AMJ.

21.     At all times material hereto, Defendant Jorge exercised operational and financial control over Defendant Premier's day-to-day operations, including control over the offering and sale of securities to Plaintiff AMJ, by virtue of his position as manager, senior officer and/or authorized representative of Defendant Premier and Defendant Florencia in her capacity as a member and manager of Defendant Premier.

## **FACTUAL BACKGROUND**

22.     Defendant Premier was organized on July 23, 2018, for the alleged purpose of operating a business engaged in the sale of consumer products related to beauty and health on TV via infomercials and home shopping networks.

23.     Initially, Defendant Florencia was the sole member of Defendant Premier. However, at all material times hereto, Defendant Jorge, Defendant Florencia's husband, exercised operational and financial control over Defendant Premier's major decisions and day-to-day operations. Plaintiffs eventually discovered that Defendant Florencia was listed as Defendant Premier's sole member because Defendant Jorge was a defendant in at least one (1) bankruptcy action in which he, upon information and belief, was accused of making misrepresentations regarding his financial condition, and because Defendant Jorge did not want his creditors to be able to collect against any of Defendant Premier's assets or cash reserves.

24.     Upon information and belief, Defendant Jorge is or has been a named defendant in other lawsuits in which he is and/or has been accused of fraud.

25.     Defendant Jorge's aforementioned legal issues, including his bankruptcy, were never disclosed to Plaintiffs prior to Plaintiff AMJ's investment in Defendant Premier.

26.     Within one (1) year of Defendant Premier's organization, Defendants began soliciting investors, one of which was Plaintiff AMJ. Commencing in June of 2019, Defendants solicited numerous meetings with Plaintiffs in an attempt to induce Plaintiff AMJ's investment. Defendant Jorge has a familial relationship with Plaintiff Silberman's wife, and at all times material hereto, knew that Plaintiff Silberman's wife came from a wealthy family that was willing and eager to assist Plaintiff Silberman in the development of his young career. Accordingly,

Defendant Jorge promised Plaintiff Silberman long-term employment and career growth with Defendant Premier in order to secure the Investment Funds.

27.     On or about July 2, 2019, Defendants met with Plaintiffs and offered Plaintiff AMJ the Securities for the first time (the "First Investor Meeting"). At the First Investor Meeting, Defendants told Plaintiffs that Defendant Premier would be the first and only company to sell CBD products on TV via home shopping networks and that it would be directed and operated by Defendant Jorge, who had over thirty (30) years of experience selling consumer products via infomercials and on TV home shopping networks. Defendants told Plaintiffs that Defendant Premier was seeking to offer long-term employment to a young professional with access to capital, like Plaintiff Silberman, who was willing to work the business with and learn from Defendant Jorge. Defendant Jorge told Plaintiffs that Defendant Premier had a valuation of Three Million Dollars ($3,000,000) (the "Initial Valuation"), and that other investors had already offered Three Hundred Thousand Dollars ($300,000) in exchange for ten percent (10%) of Defendant Premier's equity interest.

28.     On or about July 8, 2019, Plaintiffs held a second meeting with Defendants (the "Second Investor Meeting"). At the Second Investor Meeting, Defendants further discussed the investment opportunity being presented to Plaintiff AMJ, but in this instance, also extended an offer of employment to Plaintiff Silberman. In response, Plaintiff Silberman asked Defendants whether the employment offer was conditioned on Plaintiff AMJ's potential investment in Defendant Premier, which prompted Defendant Florencia to retract the offer of employment and to state, instead, that if Plaintiff AMJ invested in Defendant Premier, Plaintiff Silberman could work for Defendant Premier for a period of three (3) months without compensation to determine whether he was a good fit for the business. Defendant Florencia further stated that if Defendant

Premier determined Plaintiff Silberman to be a good fit at the conclusion of the three (3) month period, Defendant Premier would then offer a paid position to Plaintiff Silberman. Plaintiffs rejected Defendant Florencia's offer outright.

29.     On July 30, 2019, Defendant Premier filed an application with the United States Patent and Trademark Office to register Green MD Revolution ("Green MD"), a trademark designated to market and sell its CBD products.

30.     In August of 2019, Defendants informed Plaintiffs that Defendants were launching the CBD product line under Green MD and requested a meeting with Plaintiffs to further discuss Plaintiff AMJ's potential investment in Defendant Premier.

31.     On or about August 13, 2019, Plaintiffs again met with Defendants (the "Third Investor Meeting"). At the Third Investor Meeting, Defendant Jorge told Plaintiffs about his relationship with the CEO and founder of ShopHQ. Defendant Jorge represented that he could guarantee Defendant Premier's success because of his experience and lofty status in the industry and his history of selling successful products on TV networks such as ShopHQ, whose customary business practice is to work with vendors on a consignment basis. However, Defendant Jorge represented that he had a special agreement with ShopHQ pursuant to which ShopHQ would guarantee payment of purchase orders ("PO") to Defendant Premier instead of working with Defendant Premier on a consignment basis. Specifically, Defendant Jorge represented that he had this special agreement with ShopHQ for a product he sold on ShopHQ through a company doing business as "Because it Works" ("BIW"), and that he had incorporated Defendant Premier's products onto said agreement. Defendant Jorge emphasized to Plaintiffs that his personal relationship with the owner and CEO of ShopHQ ensured that Defendant Premier would have no problem getting its sales guaranteed by ShopHQ. In fact, he stated that he had already spoken to

the CEO and the owner of ShopHQ, and they agreed that the first PO for Defendant Premier's products would be placed by the end of September of 2019, and Defendant Premier's first appearance on the ShopHQ network would take place by October of 2019.

32.     Furthermore, Defendants represented to Plaintiffs that Defendant Premier did not need investors because it had enough capital and its success was all but certain. Notwithstanding, Defendants indicated to Plaintiffs that because of Defendant Jorge's familial ties with Plaintiff Silberman's wife, Defendant Premier would provide long term employment to Plaintiff Silberman if Plaintiff AMJ invested in Defendant Premier, and as a result, not only would Plaintiff AMJ be buying into a "once-in-a-lifetime" business opportunity, but Plaintiff Silberman would also be getting a great education and work experience under Defendant Jorge's tutelage. Thereafter, while assuring them that their investment in Defendant Premier would be an enormous success, Defendants presented financial projections to Plaintiffs reflecting between Twelve Million Dollars ($12,000,000) and Thirty Million Dollars ($30,000,000) in sales by Defendant Premier within one (1) year of Plaintiff AMJ's investment. Defendant Jorge further represented that BIW was getting five (5) to six (6) POs totaling approximately Two Hundred Fifty Thousand Dollars ($250,000) per year from ShopHQ, and explained that BIW was a company that only sold one product, insoles, which product was far more difficult to sell than Defendant Premier's CBD products. Defendant Jorge represented to Plaintiffs that if BIW was receiving large POs while only offering one (1) product that was difficult to sell, Defendant Premier would sell many times that amount, considering that Defendant Premier would be offering at least ten (10) products for sale in ShopHQ's highest grossing category, beauty and health. As a comparable, Defendant Jorge told Plaintiffs that the best skin care brands on ShopHQ, like Consult Health and Serious Skincare,

were each selling between Thirty Million Dollars ($30,000,000) and One Hundred Million Dollars ($100,000,000) per year.

33.     Defendants proceeded to present Plaintiffs with a list of the products allegedly containing the CBD Blends that would be branded and sold under the Green MD trademark (the "Green MD Products"), and in an effort to finally secure Plaintiff AMJ's investment in Defendant Premier, Defendants represented that:

a.  The CBD Blends contained in the Green MD Products were proprietary, and formulated and developed by Dr. Lin for Defendant Premier;

b.  Defendant Premier had spent over Twenty-Five Thousand Dollars ($25,000) developing the CBD Blends;

c.  Defendant Premier was the sole owner of the intellectual property rights in and to the CBD Blends contained in the Green MD Products;

d.  Defendant Jorge, acting on behalf of Defendant Premier, had secured exclusive rights for Defendant Premier to be the first and only company to market and sell consumer CBD products on TV shopping networks;

e.  Defendant Jorge had over thirty (30) years of experience in the industry of marketing and selling consumer products on TV via infomercials and home shopping networks, that he co-founded the National Infomercial Marketing Association, and in addition to his knowledge and expertise, he knew all the relevant people in the industry to successfully market and sell the Green MD Products;

f.  Defendant Premier could easily be sold to ShopHQ by the end of Defendant Premier's third (3rd) year in business. Defendant Jorge told Plaintiffs that he could easily sell Defendant Premier to ShopHQ because of his great relationship with its owner and CEO and said

the home shopping networks tend to purchase successful brands like Green MD. In addition, Defendant Jorge told Plaintiffs that companies like Defendant Premier generate great interest from the public, and that he would consider taking Defendant Premier public after the third (3rd) year.

34.     At the conclusion of the Third Investor Meeting, Defendants offered Plaintiff AMJ Securities representing ten percent (10%) of Defendant Premier's equity interest in exchange for Four Hundred Thousand Dollars ($400,000) (the "First Offer for Investment"), and an employment position for Plaintiff Silberman with a monthly salary of Ten Thousand Dollars ($10,000) (the "Employment Offer").

35.     To justify the discrepancy between the Initial Valuation and Defendant Premier's valuation under Defendants' First Offer for Investment, Defendant Jorge and Defendant Florencia represented that they had the Additional Products which they had previously planned to sell through other companies in which Defendant Premier's investors did not own any equity, but would instead do so through Defendant Premier, thereby increasing Defendant Premier's valuation. Defendants Jorge and Florencia told Plaintiffs that these Additional Products were already developed and would be introduced quickly and very successfully.

36.     Defendants Jorge and Florencia failed to disclose the fact that they had already tried to market and to sell the Additional Products, had failed, and were simply looking to try again, using a different brand and Plaintiff AMJ's Investment Funds to do so.

37.     On or about August 14, 2019, relying on Defendants' representations, Plaintiff AMJ accepted Defendants' First Offer for Investment, and Plaintiff Silberman accepted the Employment Offer (the "Employment Agreement"). Pursuant to the First Offer for Investment, Plaintiff AMJ agreed to invest Four Hundred Thousand Dollars ($400,000) in Defendant Premier

in exchange for ten percent (10%) of Defendant Premier's equity interest (the "First Investment Agreement").

38.     On or about August 19, 2019, Plaintiff Silberman began his employment with Defendant Premier. By September 15, 2019, Plaintiff AMJ had deposited the full amount owed under the First Investment Agreement in Defendant Premier's bank account. Upon receipt thereof, Defendants Jorge and Florencia withdrew an amount exceeding One Hundred Twenty-Five Thousand Dollars ($125,000), a portion of which they falsely alleged was used to reimburse them for the costs of formulating the allegedly proprietary CBD Blends. The remaining balance, by their own admission, was taken and used by Defendants Jorge and Florencia for their own personal use.

39.     Throughout his employment with Defendant Premier, whenever Plaintiff Silberman attempted to contribute to Defendant Premier's decision-making, Defendant Jorge routinely and dismissively called him a "rookie" who "did not know what he was doing." Indeed, as part of their fraudulent scheme, Defendants targeted young and unsophisticated investors, hoping to embezzle their funds through false promises of employment and investment returns which Defendants supported with documents and/or verbal representations containing fabricated and/or manipulated information, and which documents and/or verbal representations otherwise failed to disclose material information.

40.     For example, Defendants deceitfully and intentionally used Plaintiff Silberman's naivete against him and abused his trust by requiring Plaintiff Silberman to sign the lease for the office space Defendant Premier used, and all of the accounts related to said lease (such as the ADT alarm system account and FPL) (collectively, the "Premier Accounts"), in his personal capacity. Although Defendants assured Plaintiff Silberman that Defendant Premier would assume all responsibility for the Premier Accounts, they failed to do so following their termination of Plaintiff

Silberman's employment, leaving Plaintiff Silberman to fend for himself as he was personally liable for the Premier Accounts.

41.    In addition, after Plaintiff AMJ paid for the Securities purchased under the First Investment Agreement, Plaintiff Silberman discovered the following through his employment with Defendant Premier:

a.   the CBD Blends contained in Green MD Products were not proprietary;

b.   the Green MD Products contained chemical formulas purchased by Defendants from a company by the name of Cosmetic Solutions;

c.   Dr. Lin did not personally formulate or develop the CBD Blends. Instead, he solely acts as an actor and advertising agent for Defendant Premier. Dr. Lin, at Defendants' instruction, knowingly lies to an audience of millions by stating that he personally developed the CBD Blends using unique ingredients handpicked by him. Defendant Florencia, who also appears live on air to market the Green MD Products, routinely deceives the public about the Green MD Products and their efficacy by, among other things, lying about her age and Dr. Lin's involvement in the development of the Green MD Products. Defendants and Dr. Lin use Dr. Lin's academic credentials, which include degrees from Harvard and Yale, to attempt to give the Green MD Products credibility and to perpetrate their fraud. When Plaintiff Silberman confronted Defendants about their fraud, Defendant Jorge dismissively responded by saying that "there was nothing wrong with that because it was a marketing tactic, one that is used by all the brands selling in home shopping networks and infomercials."

d.   Defendants actively encourage Dr. Lin to appear on TV networks and advertise undeniably false facts about Green MD Products, and Defendant Jorge and Defendant Florencia provide close guidance and tips to Dr. Lin regarding the manner in which the misrepresentations

of fact about Green MD Products should be made to the public in order to maximize their effectiveness;

      e.   Defendants had not spent Twenty-Five Thousand Dollars ($25,000) formulating or developing the CBD Blends. Instead, Defendants used Fifteen Thousand Dollars ($15,000) to purchase the right to manufacture products using the formulas owned by Cosmetic Solutions, and Ten Thousand Dollars ($10,000) to pay for their credit card debt;

      f.   Defendant Jorge did not have an agreement with the CEO and owner of ShopHQ pursuant to which ShopHQ would guarantee its purchase of Green MD Products, thereby assuring Defendant Premier's sales and revenue.

      g.   Defendants had neither secured exclusive rights for Green MD Products to be the only CBD Products sold on TV via home shopping networks nor the right to be the first company to do so;

      42.   Contrary to Defendants' representations, Defendant Premier did not receive a PO from ShopHQ by the end of September 2019, nor did it make an appearance on their network by October of 2019. The foregoing resulted in Defendant Premier's failure to generate sufficient revenue to adequately carry on its business. Accordingly, on or about February 1, 2020, Defendants requested that Plaintiff AMJ make an additional investment of Fifty Thousand Dollars ($50,000) and presented Plaintiffs with documents purporting to be Defendant Premier's financial statements ("Premier's Fraudulent Financial Statements") in support of their request. In addition, Defendant Jorge represented that ShopHQ would provide him with the highlights of Defendant Premier's presentations on ShopHQ, which Defendant Jorge would then utilize to create infomercials that would be broadcast globally using Defendant Jorge's special connections in the industry. To date, Defendant Premier has not aired a single infomercial.

43.     Plaintiff AMJ, concerned that Defendants' were using Defendant Premier as an alter ego, offered to make the additional capital contributions on a pro-rata basis with Defendant Florencia, but Defendant Jorge informed Plaintiffs that Defendants Jorge and Florencia did not have any more money to invest in the business. Plaintiffs reiterated their concerns regarding Defendants Jorge and Florencia's management of Defendant Premier's operations, and told Defendants that Plaintiff AMJ would only consider contributing additional capital in exchange for more equity, more voting power, and an increased say in Defendant Premier's management and operation. Defendants refused, and Defendant Jorge told Plaintiff AMJ that Defendant Premier would seek to raise capital elsewhere through other potential investors.

44.     While Defendants targeted other potential investors, Plaintiff AMJ and Defendants had ongoing discussions and arguments about Defendant Premier's management and its operational needs. During one such discussion, Plaintiff AMJ, concerned about Defendant Premier's improper management, requested Defendant Premier's credit card statements and bank statements. Defendant Jorge indicated to Plaintiff AMJ that Defendants would never misuse investor funds and expressed dismay at Plaintiffs AMJ's mere suggestion of same. Defendant Jorge denied that Defendant Premier had engaged in any wrongdoing and authorized Defendant Premier to provide said statements.

45.     Plaintiff Silberman, relying on Defendant Jorge's aforementioned authorization, obtained Defendant Premier's credit card statements and bank statements and shared them with Plaintiff AMJ, including its members, managers, advisers, and agents. When Defendant Jorge realized that Plaintiff Silberman had provided Defendant Premier's credit card statements and bank statements to Plaintiff AMJ, he berated Plaintiff Silberman and told him that Defendant Jorge "could have explained the statements better." Defendant Premier's credit card statements and bank

statements unequivocally showed that Defendants Jorge and Florencia had misused the Investment Funds for personal reasons. When confronted about their misuse of the Investment Funds, Defendant Florencia told Plaintiffs that she "sometimes gets confused over her credit cards given that they all are blue."

46.     In fear of losing its initial investment, and not having yet discovered that Defendant Premier's Fraudulent Financial Statements had been fabricated, Plaintiff AMJ decided to contribute the additional Fifty Thousand Dollars ($50,000) to Defendant Premier in exchange for additional equity and only under certain conditions, including requiring Defendants Jorge and Florencia to reimburse Defendant Premier for all the funds misused by them for personal reasons.

47.     Relying on Defendant Premier's Fraudulent Financial Statements and other representations about Defendant Premier's management and operations moving forward, Plaintiff AMJ agreed to invest an additional Fifty Thousand Dollars ($50,000) in Defendant Premier in exchange for an additional ten percent (10%) of Defendant Premier's equity interest (the "Second Investment Agreement") (the First Investment Agreement, Second Investment Agreement, and the Employment Agreement shall hereinafter be collectively referred to as the "Investment Scheme").

48.     It was only after Defendants terminated Plaintiff Silberman's employment that he discovered that critical and material information in Defendant Premier's Fraudulent Financial Statements had been fabricated, misrepresented, and/or omitted by Defendants, and that this practice of manipulating financial documents was used by Defendants to induce Plaintiff AMJ's investment and to attempt to defraud other potential investors.

49.     In an effort to disguise the discrepancy between the price of the Securities purchased by Plaintiff AMJ pursuant to the First Investment Agreement and those purchased pursuant to the Second Investment Agreement, Defendants asked Plaintiff AMJ to memorialize

the First Investment Agreement and the Second Investment Agreement (collectively, the "Investment Agreement") as one agreement through the execution of a certain Membership Interest Purchase Agreement ("MIPA") dated February 14, 2020.

50.   On February 26, 2020, twelve (12) days after Plaintiff AMJ executed the MIPA presented by Defendants, Defendants terminated Plaintiff Silberman's employment, blocked Plaintiff Silberman's access to his business emails, cut off Plaintiff AMJ's access to Defendant Premier's books and records, and failed to pay Plaintiff Silberman the wages owed to him under the Employment Agreement for the month of February of 2020.

51.   The Securities sold by Defendants to Plaintiff AMJ pursuant to the Investment Agreement were never registered by Defendants pursuant to Section 5 of the Securities Act of 1933 (the "Securities Act").

52.   Plaintiffs have repeatedly demanded that Defendants return the Investment Funds, pay Plaintiff Silberman the wages owed to him, and provide Plaintiff AMJ with access to Defendant Premier's books and records, to no avail. Moreover, as of the filing of this Complaint, Defendants have refused to sanitize their fraud as against Plaintiffs by making Plaintiffs whole.

### COUNT I
### Violation of Section 12(a)(1) of the Securities Act
### (Against all Defendants)

53.   Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

54.   This Count I is asserted against Defendant Premier, Defendant Jorge, and Defendant Florencia for violations of Section 12(a)(1) of the Securities Act. 15 U.S.C. § 77l(a)(1).

55.   The Investment Agreement constitutes an "investment contract" and is therefore a security as set forth in 15 U.S.C. § 77b(a)(1), because:

a.      Plaintiff AMJ invested Four Hundred Fifty Thousand Dollars ($450,000) in Defendant Premier under the Investment Agreement;

b.      Plaintiff AMJ's investment under the Investment Agreement was an investment in a common enterprise;

c.      Plaintiff AMJ made the investment in reliance on Defendant Jorge's experience, knowledge, and expertise in the consumer product industry, especially in the sale of consumer products on TV via infomercials and home shopping networks;

d.      Plaintiff AMJ entered into the Investment Agreement with an expectation of profits; and

e.      Plaintiff AMJ expected its profits to be derived solely from the efforts of Defendants.

56.     Defendants offered and sold unregistered securities to Plaintiff AMJ, and in so doing, made use of instruments of transportation or communication in interstate commerce or the mails in violation of Section 5 of the Securities Act. 15 U.S.C. § 77(e).

57.     Each Defendant is a "person" as defined by 15 U.S.C. § 77b(a)(2) of the Securities Act.

58.     Each Defendant is the "seller" of the Securities purchased by Plaintiff AMJ within the meaning of the Securities Act because each Defendant solicited the purchase of the Securities by Plaintiff AMJ, motivated in large part by a desire to serve their own financial interests.

59.     Defendants' violation entitles Plaintiff AMJ to rescind the Investment Agreement and recover the Investment Funds, in addition to other relief in connection with its purchase of unregistered securities from Defendant Premier.

60.     Plaintiff AMJ hereby elects to rescind the Investment Agreement.

WHEREFORE, Plaintiff AMJ respectfully requests the entry of a final judgment in its favor and against Defendants, jointly and severally, rescinding the Investment Agreement, with pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and such further relief as this Honorable Court deems just, equitable, and proper.

**COUNT II**
**Violation of Section 15 of the Securities Act**
**(Against Defendant Jorge and Defendant Florencia)**

61.     Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

62.     This Count II is brought against Defendant Florencia and Defendant Jorge pursuant to Section 15 of the Securities Act. 15 U.S.C. §77o.

63.     At all times material hereto, Defendant Florencia and Defendant Jorge were each "controlling persons" of Defendant Premier within the meaning of Section 15 of the Securities Act by virtue of their ownership of Defendant Premier, beneficial or otherwise, and/or their positions as managers, senior officers, and/or authorized representatives of Defendant Premier.

64.     Defendant Florencia and Defendant Jorge were culpable participants in the violation of Sections 12(a)(1) of the Securities Act by Defendant Premier as alleged in Count I of this Complaint based on their agency and/or ownership interest, beneficial or otherwise, in Defendant Premier, and having otherwise participated in the process which directly resulted in Defendant Premier's sale of unregistered securities to Plaintiff AMJ.

WHEREFORE, Plaintiff AMJ respectfully requests the entry of a final judgment in its favor and against Defendants Jorge and Florencia, jointly and severally with Defendant Premier, rescinding the Investment Agreement, with pre-judgment interest and post-judgment interest at the

maximum rate allowable by law, and such further relief as this Honorable Court deems just, equitable, and proper.

## <u>COUNT III</u>
### Violation of the Securities and Exchange Act Section 10(b)
### (Against all Defendants)

65.     Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

66.     This Count III is brought against Defendant Premier, Defendant Jorge, and Defendant Florencia pursuant to 17 C.F.R. §240.10b-5, a regulation promulgated under 15 U.S.C. 78j(b), which provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

67.     At all times material hereto, Defendants employed a pattern of deceit aimed at defrauding investors and consumers alike. The Investment Scheme operated as a fraud upon Plaintiff AMJ in connection with the purchase and sale of the Securities.

68.     To obtain Plaintiff AMJ's Investment Funds, Defendants made material misrepresentations, untrue statements of material fact, and omitted statements of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth in this Complaint.

69.     The material misrepresentations, omissions, and untrue statements of material fact were made in connection with the Securities sold by Defendants to Plaintiff AMJ.

70.     As is evidenced by their manipulation and fabrication of Defendant Premier's Fraudulent Financial Statements, Defendants' conduct was intentional and willful, the purpose of which was to deceive, manipulate, and defraud Plaintiff AMJ.

71.     Plaintiff AMJ reasonably and justifiably relied upon Defendants' material misrepresentations, untrue statements of material fact, and omissions of material fact when entering into the Investment Agreement and making the investment in Defendant Premier. But for Defendants' material misrepresentations, untrue statements of material fact, and omissions of material fact, Plaintiff AMJ would not have entered into the Investment Agreement or participated in Defendants' Investment Scheme.

72.     Plaintiff AMJ has suffered damages as a direct and proximate result of Defendants' material misrepresentations, untrue statements of material fact, and omissions of material fact. The Investment Scheme itself shows that disclosure of part of the information Defendants' misrepresented and omitted caused a significant decrease in the value of the Securities purchased by Plaintiff AMJ once said misrepresentations and omissions were discovered.

73.     Defendants used the means or instrumentalities of interstate commerce to make the material misrepresentations, untrue statements of material fact, and omissions of material fact upon which Plaintiff AMJ relied when determining whether to purchase the Securities sold by Defendants.

74.     Despite Plaintiffs AMJ's demands for a return of its Investment Funds, Defendants have unlawfully retained same.

75.     Defendants' violation entitles Plaintiff AMJ to rescind the Investment Agreement and recover the Investment Funds, in addition to other relief in connection with its purchase of unregistered securities from Defendants.

76.     Plaintiff AMJ hereby elects to rescind the Investment Agreement.

WHEREFORE, Plaintiff AMJ respectfully requests the entry of a final judgment in its favor and against Defendants, jointly and severally, rescinding the Investment Agreement, with pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and such further relief as this Honorable Court deems just, equitable, and proper.

**COUNT IV**
**Violation of Securities and Exchange Act Section 20(a), 15 U.S.C § 78t**
**(Against Defendant Jorge and Defendant Florencia)**

77.     Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

78.     This Count IV is brought against Defendant Jorge and Defendant Florencia pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

79.     Section 20(a) of the Exchange Act reads, in pertinent part:

> **Joint and several liability; good faith defense**
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C.A. § 78t.

80.     Defendant Florencia participated in the operation and management of Defendant Premier, and conducted and participated, directly and indirectly, in the conduct of Defendant Premier's business affairs. At all times material hereto, Defendant Florencia was aware of the

material misrepresentations, untrue statements of material fact, and omissions of material fact made by Defendants in furtherance of their fraudulent sale of securities to Plaintiff AMJ.

81.     At all times material hereto, Defendant Florencia was a "controlling person" of Defendant Premier within the meaning of Section 20(a) of the Exchange Act by virtue of her ownership interest in Defendant Premier, beneficial or otherwise, and/or her positions as a manager, senior officer and/or authorized representative of Defendant Premier.

82.     Defendant Florencia is a culpable participant in Defendant Premier's violation of 15 U.S.C. § 78j(b) of the Exchange Act as alleged in Count III of this Complaint based on her ownership interest, beneficial or otherwise, in Defendant Premier and having otherwise participated in the process which directly resulted in Defendant Premier's fraudulent sale of securities to Plaintiff AMJ.

83.     Defendant Jorge participated in the operation and management of Defendant Premier, and conducted and participated, directly and indirectly, in the conduct of Defendant Premier's business affairs. At all times material hereto, Defendant Jorge was aware of the material misrepresentations, untrue statements of material fact, and omissions of material fact made to Plaintiff AMJ in furtherance of Defendant Premier's fraudulent sale of securities to Plaintiff AMJ.

84.     At all times material hereto, Defendant Jorge was a "controlling person" of Defendant Premier within the meaning of Section 20(a) of the Exchange Act by virtue of his exercise of operational and financial control over Defendant Premier's day-to-day operations, and/or his positions as manager, senior officer, and/or authorized representative of Defendant Premier.

85.     Defendant Jorge was a culpable participant in Defendant Premier's violation of 15 U.S.C. § 78j(b) of the Exchange Act as alleged in Count III of this Complaint based on his exercise

of operational and financial control over Defendant Premier's day-to-day operations, and/or his positions as manager, senior officer, and/or authorized representative of Defendant Premier, and having otherwise participated in the process which directly resulted in Defendant Premier's fraudulent sale of securities to Plaintiff AMJ.

86.     By reason of their conduct and position, Defendant Jorge and Defendant Florencia are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Defendant Premier.

WHEREFORE, Plaintiff AMJ respectfully requests the entry of a final judgment in its favor and against Defendants Jorge and Florencia, jointly and severally with Defendant Premier, rescinding the Investment Agreement, with pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and such further relief as this Honorable Court deems just, equitable, and proper.

<u>**COUNT V**</u>
**Violation of Florida Securities and Investor Protection Act, Section 517.301, Florida Statutes**
**(Against all Defendants)**

87.     Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

88.     This Count V is brought against Defendant Premier, Defendant Jorge, and Defendant Florencia pursuant to Section 517.301, Florida Statutes (2019).

89.     Section 517.301(1)(a), Florida Statues, provides, in pertinent part:

It is unlawful and a violation of the provisions of this chapter for a person:

(a)     In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of

s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

90.     At all times material hereto, Defendants employed a pattern of deceit aimed at defrauding investors and consumers alike. The Investment Agreement operated as a fraud upon Plaintiff AMJ in connection with the purchase and sale of securities.

91.     To obtain Plaintiff AMJ's Investment Funds, Defendants made material misrepresentations of fact, made untrue statements of material fact, and omitted statements of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Plaintiff AMJ justifiably and reasonably relied upon Defendants' material misrepresentations, untrue statements of material fact, and omissions of material fact when entering into the Investment Agreement and making the investment in Defendant Premier. But for Defendants' material misrepresentations, untrue statements of material fact, and omissions of material fact, Plaintiff AMJ would not have entered into the Investment Agreement or participated in Defendants' Investment Scheme.

93.     The material misrepresentations, omissions, and untrue statements of material fact were made in connection with the Securities sold by Defendants to Plaintiff AMJ.

94.     At all times material hereto, Defendants knew that their untrue statements were false and intentionally made them for the purpose of inducing Plaintiff AMJ's reliance thereon.

95.     As is evident by their manipulation and fabrication of Defendant Premier's Fraudulent Financial Statements presented to investors, Defendants' conduct was intentional and willful, the purpose of which was to deceive, manipulate, and defraud Plaintiff AMJ.

96.     Plaintiff AMJ has suffered damages as a direct and proximate result of Defendants' material misrepresentations, untrue statements of material fact, and omissions of material fact. The Investment Scheme itself shows that disclosure of part of the information Defendants misrepresented and omitted caused a significant decrease in the value of the Securities purchased by Plaintiff AMJ once said misrepresentations and omissions were discovered.

97.     Despite Plaintiff AMJ's demands for a return of its Investment Funds, Defendants have unlawfully retained same.

98.     Plaintiff AMJ elects to rescind the Investment Agreement pursuant to Section 517.211(3), Florida Statutes (2019).

WHEREFORE, Plaintiff AMJ respectfully requests the entry of a final judgment in its favor and against Defendants, jointly and severally, rescinding the Investment Agreement, awarding Plaintiff AMJ attorneys' fees and costs pursuant to Fla. Stat. § 517.211(6), pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and for any additional available statutory relief and other relief that this Honorable Court deems just, equitable, and proper.

<u>COUNT VI</u>
**Breach of Fiduciary Duties**
**(Against Defendant Florencia)**

99.     Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

100.     This Count VI is brought against Defendant Florencia pursuant to Section 605.04091, Florida Statutes (2019).

101.     Defendant Florencia, as the managing member of Defendant Premier and pursuant to the Florida Revised Limited Liability Company Act, owed fiduciary duties of loyalty and care to Plaintiff AMJ and to Defendant Premier and was required to comply with the standards of conduct required by section 605.04091, Florida Statutes (2019), and other applicable Florida law in discharging her duties.

102.     The duty of care requires that Defendant Florencia refrain from grossly negligent or reckless conduct, willful or intentional misconduct, or knowing violations of law. The duty of loyalty requires that Defendant Florencia not appropriate company property for her own benefit. In addition, Defendant Florencia is required to discharge her duties and obligations, and to exercise any of her rights, consistent with the obligation of good faith and fair dealing.

103.     Defendant Florencia failed to comply with section 605.04091, Florida Statutes (2019), and otherwise breached her fiduciary duties by, among other things:

     a.     Intentionally misrepresenting material facts about the Green MD Products to an audience of millions of potential customers, which misconduct, in addition to being reckless and willful, dramatically increased the risks associated with Plaintiff AMJ's investment in Defendant Premier;

b.   Knowingly violating applicable laws, including laws against false and misleading trade practices and fraud;

c.   Embezzling a portion of the Investment Funds by transferring same to a personal account;

d.   Using Defendant Premier's credit cards for personal expenses;

e.   Failing to assume responsibility for the Premier Accounts;

f.   Failing to distribute Defendant Premier's profits to Defendant Premier's members in accordance with the terms of Defendant Premier's First Amendment and Restatement of Operating Agreement of Premier Beauty and Health LLC, a Limited Liability Company, executed by and between Defendant Florencia and Plaintiff AMJ ("Operating Agreement");

g.   Failing to conduct Defendant Premier's affairs in compliance with the obligation of good faith and fair dealing.

h.   Misrepresenting Defendant Premier's relationship and agreement with ShopHQ, and manipulating and fabricating Defendant Premier's Fraudulent Financial Statements;

i.   Preventing Plaintiff AMJ from accessing Defendant Premier's books and records;

j.   Failing to market or sell the Additional Products.

k.   Failing to provide Plaintiff AMJ with reasonable access to Defendant Premier's books, records, and other information, and otherwise failing to keep Plaintiff AMJ appraised of Defendant Premier's business performance or its use of the Investment Funds, as provided by the Operating Agreement and applicable Florida law.

104.   Plaintiff AMJ suffered damages as a direct and proximate result of Defendant Florencia's breach of fiduciary duties.

WHEREFORE, Plaintiff AMJ respectfully requests a final judgment in its favor and against Defendant Florencia for actual and compensatory damages, pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and for any additional available statutory relief and other relief that this Honorable Court deems just, equitable, and proper.

## COUNT VII
### Fraudulent Inducement
### (Against all Defendants)

105.    Plaintiffs re-allege and incorporate paragraphs one (1) through fifty-two (52) as if fully set forth herein.

106.    Defendants made misrepresentations, untrue statements, and omissions as set forth in this Complaint prior to and at the time Plaintiffs entered into the Investment Scheme.

107.    Defendants' misrepresentations, untrue statements, and omissions were material.

108.    At all material times, Defendants knew that their misrepresentations and untrue statements of material fact were false and made them for the purpose of inducing Plaintiffs' reliance thereon when deciding to accept employment with and acquire the Securities offered by Defendants.

109.    Defendants intended for Plaintiffs to rely upon their fraudulent misrepresentations and omissions of material fact in entering into the Investment Scheme.

110.    Plaintiffs reasonably and justifiably relied upon Defendants' fraudulent misrepresentations and untrue statements of material facts when deciding to participate in Defendants' Investment Scheme.

111.    Plaintiffs suffered damages as a direct and proximate result of Defendants' fraud.

WHEREFORE, Plaintiffs respectfully demand a final judgment in their favor and against Defendants, jointly and severally, for actual and compensatory damages, pre-judgment interest and

post-judgment interest at the maximum rate allowable by law, and for any additional available statutory relief and other relief that this Honorable Court deems just, equitable, and proper.

**COUNT VIII**
**Breach of Employment Agreement**
**(Against Defendant Premier)**

112.    Plaintiff Silberman re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

113.    The Employment Agreement is an enforceable contract.

114.    Plaintiff Silberman complied with all of his obligations under the Employment Agreement.

115.    All conditions precedent to Defendant Premier's obligation to perform under the Employment Agreement occurred.

116.    Under the Employment Agreement, Plaintiff Silberman was entitled to receive monthly payments of Ten Thousand Dollars ($10,000) ("Salary Payments").

117.    Defendant Premier breached the Employment Agreement by failing to make the Salary Payments to Plaintiff Silberman for the month of February 2020.

118.    Plaintiff Silberman has suffered damages as a direct and proximate cause of Defendant Premier's material breach of the Employment Agreement.

WHEREFORE, Plaintiff Silberman respectfully requests a final judgment in his favor and against Defendant Premier for actual and compensatory damages, pre-judgment interest and post-judgment interest at the maximum rate allowable by law, and for any additional available statutory relief and other relief that this Honorable Court deems just, equitable, and proper.

<u>COUNT IX</u>
**Breach of Membership Interest Purchase Agreement ("MIPA")**
**(Against Defendant Premier)**

119.    Plaintiff AMJ re-alleges and incorporates paragraphs one (1) through fifty-two (52) above as if fully set forth herein.

120.    The MIPA is an enforceable contract.

121.    Plaintiff AMJ complied with all of its obligations under the Investment Agreement.

122.    All conditions required by the Investment Agreement for Defendant Premier's performance have been satisfied.

123.    Under section 5(iii)(c) of the MIPA, Defendant Premier, as seller, represents and warrants to Plaintiff AMJ, as purchaser, that "[n]either the execution or delivery of this agreement nor the consummation of the sale of the membership interest to PURCHASER [Plaintiff AMJ] will … violate any statute or law…."

124.    Defendant Premier materially breached its obligations under the MIPA by violating section 5(iii)(c) thereunder, because Defendant Premier was in violation of applicable law from the moment it began offering the Securities to Plaintiff AMJ and through the closing of the transaction memorialized in the MIPA, as set forth in this Complaint.

125.    Plaintiff AMJ suffered damages as a direct and proximate result of Defendants' material breach of section 5(iii)(c) of the MIPA.

126.    Defendant Premier's breach of the MIPA has caused Plaintiff AMJ to incur damages.

WHEREFORE, Plaintiff AMJ respectfully requests the entry of a final judgment in its favor and against Defendant Premier for actual and compensatory damages, pre-judgment interest

and post-judgment interest at the maximum rate allowable by law, and for any additional available statutory relief and other relief that this Honorable Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated this 12th day of May, 2020.

Respectfully submitted,

**G&F LAW GROUP, LLP**
Alexander C. Flint, Esq.
Florida Bar No. 117715
I. Albert Gonzalez, Esq.
Florida Bar No. 695971
Ariel Rapaport, Esq.
Florida Bar No. 1011939
15807 Biscayne Blvd, Suite 217
North Miami Beach, FL 33160
Telephone: (305) 503-9073
Fax: (305) 397-2716
acf@gflawgroup.com
iag@gflawgroup.com
arap@gflawgroup.com

/s/ Alexander C. Flint
Alexander C. Flint, Esq.

/s/ I. Albert Gonzalez
I. Albert Gonzalez, Esq.

/s/ Ariel Rapaport
Ariel Rapaport, Esq.